**LAW OFFICE OF HEATHER J. MATTES**
105 South High Street, 3rd Floor
West Chester, PA   19382
Telephone: (610) 431-7900
Attorney Identification: 42364
hjm@hjmattes.com
BY: Heather J. Mattes

**LAW OFFICE OF ARTHUR THOMAS DONATO, JR.**
216 West Front Street, 2nd Floor
Media, PA   19063
Telephone: (610) 565-4747
Attorney Identification: 31666
Art@artdonato.com

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **V.** | : | **CRIMINAL NO. 22-35-1** |
| **ANDREW WOLF** | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I. INTRODUCTION AND BRIEF PROCEDURAL HISTORY**

Andrew Wolf and Kray Strange met online in 2020. Most of their communication was by Telegram texts. The text messages and other evidence in the case establish the defendants produced pornographic pictures of juveniles from 12 to 16 years old by "catfishing." That is, they posed as young women to obtain pornographic pictures and videos of the minors in this case.

The offense conduct was discovered in July 2021 when Dropbox flagged an image from Andrew Wolf's URL and forwarded it to the National Center for Missing and Exploited Children.(PSR #16).  Investigation quickly led back to him, and the FBI served a search warrant at his home on October 7, 2021 seizing his electronic devices, CD's and phone. He was arrested immediately and has been incarcerated for the 16 months since.

On November 26, 2022, Andrew Wolf entered guilty pleas to all counts against him with no plea agreement. He is before the Court for sentencing.

As the Court well knows, Since *United States v. Booke*r, it must engage in a three-step process in sentencing. *United States v. Gunter*, 462 F.3d 237 (3d Cir. 2006). sentencing procedures require a three-step process:

1. Courts must continue to calculate a defendant's advisory Sentencing Guidelines sentence range as it did before *Booker* to determine an initial benchmark.

2. "In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation." U.S. v Wise, 515 F.3d 207, 216.

3. Finally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] section § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines. *Gunter* at 247.

## II. OBJECTIONS TO THE PRESENTENCE REPORT:

Defense Counsel submitted a letter to the Federal Probation Officer on February 3, 2023, stating the objections to the Draft Presentence Report.[1] The objections that have not been resolved are noted in the PSR.

## III. SENTENCING STANDARDS SINCE *BOOKER*

A. The Sentencing Guidelines are a "Starting Point."

Although the Court must still correctly determine the sentencing Guideline range, the Sentencing Guidelines are only one of seven factors considered under 18 U.S.C. § 3553(a). The court must consider all the sentencing factors and may not treat the Guidelines as either mandatory or presumptively reasonable. *Gall v. U.S.* 552 U.S. 38, 51 (2009). They are due "respectful consideration," not more. Rather, the court must "make an individualized assessment based on the facts presented" and "explain how the facts relate to the purposes of sentencing." *Kimbrough v. United States* 552 U.S. 85, 49-50, 53-60 (2007). In *Rita v. United States*, 551 U.S. 127 S.Ct. 2456, (2007) the Supreme Court reiterated *Booker's* holding that the Sentencing Guidelines were advisory only. The Court held appellate courts could presume reasonableness

---

[1] Exhibit A.

from a sentence within the Guidelines sentences in the "mine run" of cases but could not presume unreasonableness from sentences imposed outside the Guidelines:

> For one thing, the presumption is not binding. It does not, like a trial-related evidentiary presumption, insist that one side, or the other, shoulder a particular burden of persuasion or proof lest they lose their case. […] Nor does the presumption reflect a strong judicial deference of the kind that leads appeals courts to grant greater factfinding leeway to an expert agency than to a district judge. *Rita*, 551 U.S. at 339, 127 S.Ct. at 2463 [internal citations omitted]

*Gall v. United States* 552 U.S. 38, 128 S.Ct. 586 (2007) addressed the proportionality aspect of a sentence that varies from the Guidelines holding an outside the Guidelines sentence have "sufficiently compelling" justification for the deviation from Guidelines that are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." Id. at 47 and 594 quoting *United States v. Rita* at 349, 127 S.Ct. 2456. While permitting an appellate court to consider the degree of variance and the extent of deviation from the Guidelines in reviewing the reasonableness of a sentence:

> "[w]e reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.*, at 47 and 595.

Quoting *Rita*, the Court found the rejected approaches came too close to creating a presumption of unreasonableness for sentences outside the Guidelines noting, "Even the Government has acknowledged that such a presumption would not be consistent with *Booker*." *Id.*

Issued the same day, *Kimbrough v. United States,* 552 U.S. 85. 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) considered the effect on judicial discretion where the Sentencing Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." Id at 575, 109. As is discussed in the next section of this memorandum, it is not an abuse of discretion to

conclude Guidelines promulgated absent the use of empirical data and national experience "yield[s] a sentence greater than necessary to achieve § 3553(a)'s purposes even in a mine-run case." *Kimbrough* at 110.

In *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890 (2009) (per curiam) the sentencing judge stated, "'the Guidelines are considered presumptively reasonable,'" so that "'unless there's a good reason in the [statutory sentencing] factors…, the Guideline sentence is the reasonable sentence.'" The Fourth Circuit affirmed. The Supreme Court granted certiorari and vacated the sentence remanding for further consideration in light of *Rita* and *Gall.* It granted certiorari a second time when the Fourth Circuit again affirmed absent further briefing finding the district court had not treated the Guidelines as mandatory: "That is true, but beside the point. The Guidelines are not only not mandatory on sentencing courts, they are not to be *presumed* reasonable." *Id.* at 352, 892 [emphasis in original][2] Referring to *Gall* and *Rita*, the Supreme Court reviewed sentencing in the larger context of § 3553(a):

> "We repeat that the presumption before us is an appellate court presumption.... [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." 551 U.S., at 351, 127 S.Ct. 2456. And in *Gall v. United States*, 552 *U. S.*38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable." Instead, the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter. *Nelson v. United States*, 555 U.S. 350, 351, 129 S. Ct. 890, 891-92. (2009)

Ultimately, the sentencing Court has an "overarching duty to impose a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing." *United States v. Pepper* 131 S.Ct. 1229, 1243 (2011).

---

[2] The Third Circuit applied this analysis in *U.S. v. Hinton,* 402 Fed.Appx. 730 (2010) unpublished opinion.

B. Appellate Standard of Review:

On appeal, the two-step review for reasonableness established in *Gall* examines the sentencing process first. If the sentencing court incorrectly calculated the Sentencing Guidelines range, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors, selected a sentence based on clearly erroneous facts or failed adequately to explain the sentence, it might be found procedurally unreasonable.

The sentencing court must provide its substantive reasons for sentencing as part of the sentencing process. Since *United States v. Booker* appellate review for "Substantive reasonableness" under an abuse of discretion standard considers the totality of the circumstances. *United States v. Gall*, 552 U.S. 38, 51 (2007). In upholding a probationary sentence for tax evasion, the Third Circuit stated the extent of its deference in *United States v. Tomko*:

> "Ultimately, the touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a) *United States v. Grier*, 475 F.3d 556, 571 (3d Cir.2007)(en banc); see also *Cooper*, 437 F.3d at 330 ("[W]hat we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section § 3553(a)." "An estimation of the outer bounds of what is 'reasonable under a given set of circumstances may not always be beyond debate, but the abuse-of-discretion standard by which the estimation must be judged limits the debate and gives district courts broad latitude in sentencing." *Levinson*, 543 F.3d at 195 *United States v. Tomko* 562 F.3d 558 at 568 (3d Cir. 2009). (internal quotations and citations omitted).

In *Tomko,* the district court made an individualized assessment that the recommended Sentencing Guidelines range was excessive in the particular instance in light of the § 3553(a) factors. The Third Circuit examined the reasons for the deferential standard of review reinstated by *Booker*. First, "deferential review is used when the matter under review was decided by

someone who is thought to have a better vantage point than we on the Court of Appeals to assess the matter." *Tomko*, at 555. The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Gall* 128 S.Ct. at 597. The sentencing judge has access to, and greater familiarity with the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court. *Id.*, at 597-98 quoting *Rita v United States.* Second, the issues are "fact-bound and ill-suited for appellate rule making." *Id.* "A district court's departure decision involves 'the consideration of unique factors that are little susceptible…of useful generalization and as a consequence, de novo review is 'unlikely to establish clear Guidelines for lower courts. *Koon v. United States*, 518 U.S. 81, 235, 116 S.Ct. 2035 (1996). Finally, the sentencing court has an "institutional advantage in making determinations under § 3553(a) given the number of sentences than appellate courts review. *Tomko* at 566. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id*. Therefore, the extent of the deferential standard of abuse of discretion in a case where the sentencing court provides reasons under § 3553(a) that the Guidelines are excessive in the particular case is such that [I]f the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *Id.* 568

     C. The Policy Issue:

     Sentencing courts are entitled to find as a matter of policy that the Sentencing Guidelines are excessive. *Spears v. United States* 555 261, 129 S.Ct. 840 (2009) upholding a district court's substitution of a 20:1 crack cocaine ratio.

     In the current case, the court is justified in finding both that the sentencing Guideline range is excessive as a matter of policy and as it applies to the individual case in light of the § 3553(a)

factors. The following section addresses the reasons this court should vary from the U.S.S.G. on policy grounds. (Section IV). Section V discusses the reasons the court may depart based on factors not or inadequately considered by the U.S.S.G. that place the case outside the heartland of the sentencing Guidelines. Section VI reviews the reasons the Sentencing Guidelines result in a range that is more than necessary to achieve the goals of sentencing in this case in light of the § 3553 factors.

## IV. <u>The History of U.S.S.G. § 2G2.1 Establishes it Lacks an "Empirical Basis."</u>

<u>Overview: The "Kimbrough Analogy."</u>

As discussed above, the current sentencing era began with *United States v. Booker*, 543 U.S. 220 (2005) rendering the Sentencing Guidelines "effectively advisory" by explicitly excising 18 U.S.C. § 3553(b)(1) and § 3742(e) and returning to the reasonableness standard of review under the § 3553(a) factors in effect under *Koon*.  Eight Supreme Court cases directly related to the function of the U.S.S.G. have issued since.[3] The development of sentencing standards since *Booker* empowers a sentencing court to vary from Sentencing Guidelines based on a disagreement with them as a matter of policy where it finds the Guideline itself fails to reflect § 3553(a) considerations. In *Kimbrough v. United States*, the Supreme Court found a sentencing judge could consider the disparity between the treatment of crack versus powder cocaine offenders before and after the 2010 Fair Sentencing Act and reject the harsher treatment for crack cocaine offenders.  The Court restated the United States Sentencing Commission's "key role" to "formulate and constantly refine national sentencing standards." (*Id.* at 108 quoting *United States v. Rita*), by "basing its determinations on empirical data and national experience guided by a professional staff with appropriate expertise." Id. at 109. Under general circumstances, the

---

[3] *Rita v. U.S.*, 551 U.S. 338 (2007); *Gall v. U.S.*, 552 U.S. 38 (2007); *Kimbrough v. United States.,* 552 U.S. 85 (2007) issued the same day as *Gall*; *Irizarry v. U.S.*, 553 U.S. 261 (2008); *Spears v. United States.*, 551 U.S. 261 (2009); (per curiam); *Nelson v. United States,* 555 U.S. 350 (2009); *Dillon v. United States* 130 S.Ct. 1229 (2011) and *Pepper v. United States.,* 131 S.Ct. 1229 (2011)

Supreme Court found the Sentencing Guidelines recommendations "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives" (*Rita*, 551 U.S. at 350, S.Ct. at 2465) while acknowledging in every case the sentencing court has "greater familiarity with the…individual case and the individual defendant before him than the Commission or the appeals Court. *Id*., at 357-358. Because the Supreme Court found the crack cocaine Guidelines did not exemplify the sentencing commission's exercise of its institutional role in basing Guidelines on the Anti-Drug Abuse Act of 1986, Pub. L. 99-570, the Court held there was no abuse of discretion for a district court to conclude "when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary to achieve § 3553(a)'s purposes, even in a mine run case." *Id*., at 110.

Congressionally-directed Guidelines have no more authority than those the United States Sentencing Commission [hereinafter, USSC] promulgates on its own. *Kimbrough* permits district courts to vary "even where a Guideline provision is a direct reflection of a congressional directive." *Arrelucea–Zamudio,* 581 F.3d 142, 150 (2009) (quoting *Stone,* 575 F.3d 83 at 89); *see also id.* at 151. ("In sum, a Guideline is not a statute.  If Congress does not want district courts to exercise their judicial function to sentence defendants based on the facts and circumstances of each case under the guidance of the § 3553(a) factors, then it has the power to amend the pertinent statute."). *United States v. Grober*, 624 F.3d 592, 608-09 (3d Cir. 2010).

The "Kimbrough" analysis applies to U.S.S.G. § 2G2.1. The historical development of the Sentencing Guidelines establishes the lack of the USSC's institutional role to formulate Sentencing Guidelines based on national experience, data and expertise. Rather, amendments to the Guideline were frequently made in response to congressional directives or direct amendment as in the 2003 PROTECT Act. While this Court is not *compelled* to engage in an independent empirical analysis of the sentencing Guideline or to reject it,[4]  § 2G2.1's provenance

---

[4] *Grober* at 609, *United States v. O'Connor*, 601 Fed. Appx. 149 (3d Cir. 2015) (unpublished opinion).

deserves the Court's consideration as to whether a Guideline so violative of the USSC's statutory charter deserves even less deference than *Booker* provides for it.


    A. <u>The Purpose and Intent of Federal Child Pornography statute §2251</u>.

    The Child pornography statute in this case, 18 U.S.C. § 2251 (and U.S.C. § 2252) was promulgated in 1978 under the "Protection of Children Against Exploitation Act of 1977, Pub. L. 95-225.  During the next thirty-six years, Congress frequently amended the statute.[5] Between

---

[5] Beginning in 1984 when 18 U.S.C. §2251's maximum penalty carried a penalty of not more than 10 years imprisonment and a fine up to $10,000.00. Because § 2251 is the statute subject statute, the discussion focuses on § 2G2.1.

1978 and 2012, Congress amended 18 U.S.C. § 2251 and 18 U.S.C. § 2252 in tandem eight times[6] rarely altering one statute without amending the other.[7]

The Senate Report of the Judiciary Committee drafting the original statutes in 1977 focused on interstate and international businesses producing and distributing child pornography.[8]

---

[6] Pub. L. 98-292, May 21, 1984: 18 U.S.C. § 2251 max. fine to $100,000 for the first offense and $200,000 for the second offense. Congress found that "Child pornography has developed into a highly organized, multi-million dollar industry with operates on a nationwide scale[.]" Note, HR 3635, SEC. 2.

Pub. L. 99-500 and 591, October 8 and 13, 1986: 18 U.S.C. § 2251 replaced the 2-year mandatory sentence with "not less than five years." for repeat offenders and created a civil remedy with a minimum of $50,000.00 damages.

Pub. L 100-690, November 18, 1988: Sec. 7511: amended 18 U.S.C. § 2251 to include the phrase: by any means including by computer" after "interstate or foreign commerce.".

Pub. L. 103-322, September 13, 1994: added the penalty enhancement and "attempts or conspires to violate" to the statute.

Pub. L. 104-71, December 23, 1995: directed the Sentencing Commission to increase the base offense level 18 U.S.C. § 2251 by two levels, SEC. 2, and increased the penalty for the use of a computer, SEC. 3.

Pub. L. 105-314, October 30, 1998: among other amendments, expanded the jurisdictional basis for the statute, Title II.

Pub. L. 108-21, April 30, 2003: the PROTECT Act: directly amended § 2G2.1 and § 2G2.2; increased the statutory maximums; reduced departures.

Pub. L. 110-358, October 8, 2008: Sec.103 inserted the language, "using any means or facility of interstate or foreign commerce or" after "be transported" in all applicable sub Sections.

[7] Pub. L. 99-628 (1986) amended 18 U.S.C. § 2251 banning advertising child pornography.

Pub. L. 109-248, 120 Stat. 614 (2007) amended 18 U.S.C. § 2251(e) to replace "sexual exploitation of children" with specific criminal acts and adding a 30 year mandatory minimum for repeat offenders.

Pub. L.110-401 (2008) added the phrase, "or for the purpose of transmitting a live visual depiction of such conduct" to all the subsections of 18 U.S.C. § 2251.

Pub. L. 112-206 (2012) Directed the USSC to review and amend the Guidelines for Chapter 110 offenses to provide for an additional penalty where physical injury to a person less than 18 years of age is caused or threatened. (Sec. 3).

[8] The Subcommittee heard testimony from those who had been in films, seen prostitution rings, and reporters on the subject.  It made the initial finding that "child pornography and child prostitution have become highly organized, multi-million dollar industries that operate on a nationwide scale." S. Rep. 95-438, S. Rep. No. 438. 95th Cong., 1st sess. 1977, 1978 U.S.C.C.A.N. 40, 1977 WL 9660 (Leg.Hist.), p.5.

The Committee was convinced state authorities alone could not solve the problem and called for a coordinated effort between state and federal authorities to address it.[9] However, the Committee also considered the need to balance law enforcement responsibilities. Therefore, Title 18 U.S.C. § 2251 provided the mens rea the defendant act knowingly the material would be transported in interstate commerce to differentiate jurisdictional boundaries with state authorities although the jurisdictional issue would be decided on a case-by-case basis.

In 1977:

> The Senate Judiciary Committee [was] aware that, section 18 U.S.C. § 2251 may literally encompass isolated individual acts involving the use of children in the production of sexually explicit materials. Section 18 U.S.C. § 2251 is not intended to reach all such isolated incidents, which often are more appropriately the subject of state or local concern. The committee fully intends that federal prosecutors will wisely exercise their discretion to reach only those cases which are the proper subject of federal concern."[10]

The USSC, however, maintained in subsequent Reports the legislation always had a wide scope. See, e.g. The 1996 USSC Report to Congress mandated by the Sex Crimes Against Children Prevention Act of 1995 (SCACPA), Pub. L.104-71 stating 18 U.S.C. § 2251 legislation criminalized the use of foreign or interstate commerce for the production of child pornography "on large or small scale." The 2009 USSC Report on the History of the Child Pornography Guidelines [hereinafter 2009 Guideline Report] maintained the legislative intent of enacting 18 U.S.C. § 2251 was to "ferret out individual traffickers" citing to the same Senate Judiciary Report. Throughout the legislative history of statutory amendments, the Sense of the Congress statements regarding federal child pornography legislation emphasized federal resources should be aimed at large scale operations. The 2003 PROTECT Act Sense of the Congress stated, "the Child Exploitation and Obscenity Section of the Criminal Division of the Department of Justice should focus its

---

[9] Id., p. 10. Only six states had laws against the production of child pornography at the time.

[10] Senate Judiciary Committee Report, p. 16.

investigative and prosecutorial efforts on major producers, distributors, and sellers of obscene material and child pornography…" 149 Cong. Rec. H2950-01, 2003 WL 1832092. In the Adam Walsh Child Protection and Safety Act of 2006, the Findings of the Congress cited intrastate production of child pornography for its impact on the interstate "multimillion-dollar" market, and stopping it would reduce interstate child pornography, Pub.L. 109-248, July 27, 2006, 120 Stat 587, Sec. 501(1) (B), (E).[11]

18 U.S.C. § 2251 and 18 U.S.C. § 2252 are closely related statutes with the same history, policies, and goals. They were enacted at the same time, pursuant to the societal value that large-scale purveyors and producers of child pornography deserve dedicated, substantial resources to investigate the offenses and the most severe sentencing consequences. Congress maintained that policy justification through findings and subsequent statutory amendments. The current offense conduct is not on the scale the statutes, the overall legislative Acts or their Amendments were enacted to remedy.

The United States Sentencing Commission does not publish data differentiating between "large scale" international distributors and individuals whose conduct, while criminal, falls well outside the intention of the statutes as promulgated involving relatively few images or no interstate connection beyond the internet server.  In either case, a defendant's Guidelines will be the same, and he will subject to a 15-year mandatory minimum sentence at least.[12] For the reasons that follow, the Court should find the advisory Guideline yields a result that is far in excess of what the § 3553(a) factors suggest.

---

[11] The Court in *United States v. Hanson* noted "Congress has repeatedly amended U.S.S.G. § 2G2.2 "ostensibly to target mass producers of child pornography and /or repeat abusers of children, a class of offenders that make up less than 5% of those affected by the changes." *United States v. Hanson*, 561 F. Supp.2d 1004, 1009 (2008 E.D. Wisconsin).

[12] A detailed review of the Federal Sentencing Guidelines: U.S.S.G. § 2G2.1's History and Relationship to Statutory Amendments is located in the APPENDIX.

**B. <u>The Effects of Congressional Policy Making on Sentencing Guidelines U.S.S.G. § 2G2.1 and U.S.S.G. § 2G2.2.</u>**

Congressional directives and mandatory minimum increases culminating in The Protect Act and Guideline Amendment 664 resulted in substantial flaws in the child pornography Guidelines.

In *United States v. Dorvee*, 616 F.3d 174,184 (2d Cir.2010) The Second Circuit Court encouraged district courts "to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2… bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id*., at 188. The Third and Ninth Circuits agreed. See, *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010). Grober, 624 F.3d at 604 (citing U.S. Sentencing Commission, The History of the Child Pornography Guidelines (Oct. 2009), available at <u>https://www.ussc.gov/research/research-reports/2009-history-child-pornography-Guidelines</u> )[13]

As with U.S.S.G. § 2G2.2, U.S.S.G. § 2G2.1 raises sentences based on aspects inherent to the offense or present in almost every case including the age of the victim, use of computer and distribution of material. District courts have acknowledged the defects are the same for both: "U.S.S.G. §2G2.1 has some of the same flaws that I found warranted categorical rejection of U.S.S.G. §2G2.2 [i.e., it does] not distinguish between least and worst offenders . . . and [gives] excessive weight to some otherwise *proper* factors […] Thus, I find that U.S.S.G. § 2G2.1 can be rejected on categorical, policy grounds." *United States v. Jacob,* 631 F.Supp.2d 1099, 1115 (N.D. Iowa 2009). "The child pornography production Guideline, U.S.S.G. § 2G2.1, shares many of the same flaws identified by this Court when it reviewed the child pornography distribution Guideline U.S.S.G. § 2G2.2. *See Dorvee*, 616 F.3d at 184-88." *United States v. Muzio*, 966 F.3d 61, 71 (2nd Cir. 2020) Stefan R. Underhill, *District Judge*, dissenting.

---

[13] Exhibit B (screen shot of 2009 USSC report).

The USSC's Reports concerning child pornography discuss enhancements and Specific Offense Characteristics that are not specific affecting sentencing under § 2G2.1. In its October 2021 Report concerning production offenses,[14] 60% of those sentenced in 2019 were in a position of trust. (p. 30); 44% had remote contact with the victims (pp. 30-31) and almost half (45.7%) received the Guideline enhancement for misrepresentation. (p. 20).

The 2021 Report also notes the effect of PROTECT ACT between 2005 and 2019. Although the Guideline has increased, sentences have decreased or remained steady.[15] While the average Guideline minimum rose from 217 to 275 months between 2005 and 2019, the rate of within range sentences decreased due to non-government sponsored downward variances. Specifically, between 2005 and 2019, the percentage of non-government sponsored downward variances increased from 16.7% to 57.2% of cases. (U.S.S.C. 2019 Child Pornography Production Report, p. 22).

The history and nature of the applicable Sentencing Guideline in this case provides the court a policy-based reason to reject it. The suggested Guideline range does not differentiate between the least and worst offenders and places first offenders such as Andrew Wolf at the statutory maximum because the advisory Guideline so far exceeds both it and the applicable mandatory minimum. The failure to make this differentiation therefore results in sentences that fail to meet the requirements of 18 U.S.C. § 3553(a) even in ordinary cases. The fact Congress maintains the ultimate authority over the Guidelines and may enact directives the Commission is obliged to implement does not prevent a sentencing court from varying from the Guidelines, "even where a Guideline provision is a direct reflection of a congressional directive." *Arrelucea-Zamudio.*

---

[14]https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-production-offenses. Screen shot of URL, Exhibit C.

[15] The average Guideline minimum in 2005 was 275. In 2019 it was 332 months. Sentences have remained steady or slightly decreased. They averaged from 281 in 2005 to 275 in 2019 (U.S.S.C. 2021 Child Pornography Protection Report p. 21).

Supreme Court, Third Circuit and other precedent support a finding the Sentencing Guideline applicable in this case was not developed by the sentencing Commission in its characteristic role of basing its determinations on empirical data and national experience. It is therefore unlikely to reflect a "rough approximation of § 3553(a)'s objectives." The Court's policy-based variance would not be subject to "closer review" or be "suspect."  See *Kimbrough*, 552 U.S. at 109-110; *Spears*, 555 U.S. at 264; *Rita*, 561 U.S. at 348, 349-350.[16]

Even if this Honorable Court does not have a policy disagreement with the applicable Sentencing Guideline, it may certainly consider its history and nature in deciding how much weight it deserves in this case especially when application of the Guideline is so eccentric that both a

---

[16] See also *U.S. v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § U.S.S.G. § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop U.S.S.G. § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); id. at 608-09 ("Congress, of course. . . may enact directives to the Commission which the Commission is obliged to implement," but "*Kimbrough* permits district courts to vary even where a Guideline provision is a direct reflection of a congressional directive");*U.S. v. Dorvee,* 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough's* holding that "it was not an abuse of discretion" for a district court to disagree with the crack Guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *U.S. v. Henderson,* 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); id. 963 n.3 ("That Congress has the authority to issue sentencing directives to the Commission" and "that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge."); *U.S. v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a Guideline provision is a direct reflection of a congressional directive," including the career offender, fast-track, and child pornography Guidelines); id. at 93-94, 97 (district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the "Guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *U.S. v. Halliday,* 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject any Guideline on policy grounds," but the defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] Guidelines"); *U.S. v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir.2010) (defendant's argument for a policy-based variance from § U.S.S.G. § 2G2.2 was "quite forceful" but he "did not raise the argument that the Guidelines are entitled to less deference because they are not the result of empirical study by the Commission").

first offender with zero prior record has a Guideline range of life that is limited by the statutory maximum for each count under § 5G1.1(b) and the mandatory minimum sentence is 15 years.

## V. VARIANCES[17]

**A. The Sentencing Guidelines Conflict with U.S.S.G. § 3553 (a)'s directive to impose a sentence that is "sufficient but not greater than necessary in Andrew Wolf's case. Therefore, the court should vary downward in sentencing.**

This motion for variance incorporates the discussion set forth at Section V and applies it to the specific case before the Court. Ultimately, a sentencing court has the duty to formulate a sentence that is sufficient but not more to fulfill the three goals of sentencing: retribution, deterrence and rehabilitation. Specifically, Sentencing Guideline § 2G2.1 has the following flaws:

1. It produces sentences that lack proportionality in violation of 28 U.S.C. § 994(m)

2. It produces sentences in violation of 28 U.S.C. § 994(h) in that it fails to graduate sentences.

## B. A Variance Should be Granted Based on Andrew Wolf's Vulnerability to Victimization in Prison

The Bureau of prisons attempts to segregate inmates with child pornography offenses from other from the general prison population since those with such convictions are well known to be vulnerable to victimization by other inmates based on the offense.[18] When he was incarcerated at FDC Philadelphia, Mr. Wolf was intimidated by other inmates more than once and had his personal items taken from him.

---

[17] Additional Motions for Variances are included under § 3553 factors.

[18] Sexual assault and victimization in prison is widely perceived as a collateral consequence of offending. See, e.g. Why We Let Prison Rape Go On New York Times April 18, 2015. http://www.nytimes.com/2015/04/18/opinion/why-we-let-prison-rape-go-on.html?_r=0 EXHIBIT D.

Sexual assault is an ongoing problem in federal and other prisons. The failure to protect women in federal prisons is the subject of a congressional investigation and report.[19] The victimization, intimidation and sexual assault of incarcerated men has long been thought of as a collateral effect of conviction. In January 2023, The Bureau of Justice Statistics substantiated over 5000 incidents of sexual assault and intimidation between 2016 and 2018.[20] The number of unreported assaults remains unknown.

## VI. 18 USC § 3553(a) FACTORS

"A district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "'outside the heartland' to which the Commission intends individual Guidelines to apply.'" *Spears v. United States* 555 U.S. at 264, 129 S.Ct. 840, 843 citing *Kimbrough v. United States,* 552 U.S. at 109, 128 S.Ct. at 563 quoting *Rita v. United States*, 551 U.S. 338, 351, 127 S.Ct. 2456. Ultimately, a sentencing court has the duty to formulate a sentence that is sufficient but not more to fulfill the three goals of sentencing: retribution, deterrence and rehabilitation. There are reasons related to all aspects of 18 U.S.C. § 3553(a) to sentence Andrew Wolf to no more than the mandatory minimum sentence.

## § 3553(a)(1) The Nature and Circumstances of the Offense[21]

---

[19] Sexual Abuse of Female Inmates, December, 2022, available at https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf   EXHIBIT E.

[20] January 2023, United States Department of Justice, Bureau of Justice Statistics Report, EXHIBIT F.

[21] "Child pornography harms and debases the most defenseless of our citizens." *United States v. Williams*, 553 U.S. 285, 307, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008) Nothing in this Memorandum denies Andrew Wolf's guilt or denigrates the effect of the offense conduct on the teens or their parents. Rather, since

Child pornography production is a serious offense. While the facts of this case fit the production statute, 18 U.S.C. § 2251, the circumstances do not align with the policies the child pornography statutes were promulgated to promote. Most significantly, the pictures were not produced as mementos of rape or other sexual assault. One minor had advertised his pictures were available for sale. In contrast, see e.g., *U.S. v. Norton*, 557 Fed.Appx. 615, 2014 WL 903370, (8th Cir. 2014) (unpublished opinion) affirming a 360 month sentence for production where the defendant took twelve graphic photos of himself assaulting a four-year old and emailed them to others. *U.S. v. Coates*, 462 Fed. Appx. 199 (3d. Cir. 2012) upholding a 300 month sentence where the defendant filmed and distributed repeated sexual conduct with his two year old daughter.[22] While the young people involved were traumatized, because all activity occurred online they were never in danger of physical harm or subjected to sexual assault. These factors deserve the court's consideration for a downward variance.

Throughout their relationship, Kray Strange and Andrew Wolf engaged in appalling text messages. However, the messages, while offensive, are not the criminal offense. As difficult as it can be, the chats themselves should not override the court's reasoned decision-making as to the criminal conduct.

**The History and Characteristics of the Defendant**.

Family History: The Presentence Investigation Report (PSR) discusses Andrew Wolf's family history (paragraphs 174 through 182). Andrew has enjoyed a close relationship with his family, especially his parents and maintained a life-long interest in genealogy including traveling

---

sentencing is a process of considering and understanding all aspects in reaching a just result. The facts differentiating this case from others are offered toward that end.

[22] In factual and legal contrast to the current case stands *U.S. v. Irey*, 612 F.3d 1160 (11th Cir. 2010) The defendant traveled outside the united states, victimized fifty four to six year olds in movies and photographs producing over 1200 photo doing outrageously craven things to them and sharing the images over a period of years. His Guidelines were 360 months.

to Germany to discover more about the family's history and maintaining genealogical records for the family's benefit.

As revealed in the letters from family and friends (marked collectively herein as Exhibit G) Andrew has been candid with family members about his offense conduct. They describe him as having a "kind heart" (Bonnie Wolf Pincus letter) and as having a positive influence on other people and being a peacekeeper (Jennifer Wolf letter).

Family members describe him in universally positive terms especially his zeal for teaching and his intelligence. Moreover, family members describe how he has done things to assist them personally through the years. His Aunt Geri Tyler, in addition to describing him as thoughtful and helpful, writes Andrew was there to help her when she needed him and helped her move from one place to another.

Similarly, friends and neighbors who have known Andrew since he was a young boy describe him in terms of his dedication and hard work (letters of Barry Rabner and Loretta and Paul Esterheld). More specifically, Linda Panasci wrote how Andrew has not only been patient and encouraging, he helped her husband, who has had a traumatic brain injury, in his recovery by encouraging him and being patient and understanding with him. Ms. Panasci has known Andrew for 35 years. She supervised him when he was an intern as a high school senior. Andrew also helped Jannis Meents, a German exchange student, who came to the United States and Andrew not only made him feel at home but took him on trips around the area. They have remained friends since 2013 although Mr. Meents lives in Germany.

All of those who are aware of his personal history mention Andrew as an excellent father who cared very much for his new-born daughter as well as other people around him.

Finally, Andrew is an excellent teacher. He received awards at Springside Chestnut Hill Academy (SCH). See attached exhibits for his leadership in the MATHCOUNTS competition

(Exhibit H) for the years 2006-2010, 2016-2018, and 2020, when he coached the team to championships.

Education: From the time he was young, Andrew excelled in scholastics. Beginning in middle school, Andrew had straight As for a final average in 1994 and earned a scholarship award in memory of a school mate who had died. He won awards for speaking German in eighth grade, the MATHCOUNTS competition in Montgomery County (for which he earned a commendation) and began studying high school math during eighth grade. He also participated in theater.

Through high school Andrew played clarinet and performed in school plays becoming the music director for the school play as a senior. He also engaged in summer theater and participated in the German exchange program, traveling to Germany. Andrew was a member of the computer, drama, math and German clubs as well as concert band, men's chorus, and the musicals. He was inducted into the National Honor Society and received a commendation in the National Merit Scholarship Program and from the Chamber of Commerce for community service. (collectively I). He graduated first in his high school class.

Andrew was fortunate to attend Cornell University and to graduate with an engineering degree. He continued his participation in music and playing in the pep band in college.

Sports: Andrew has always been interested in baseball, has played tennis and coached baseball at Springside Chestnut Hill Academy for fifteen years. He maintains his interest in sports, especially the Phillies, to this day.

Employment: Beginning when he was in college, Andrew has always been employed. He worked for Exxon Mobile as a summer intern. He taught at Huntington Learning Center from 2002 to 2004 and began as a substitute teacher at Abington School District while going to school at Arcadia University earning his teaching certificate. In 2004 Andrew was hired at Chestnut Hill/Springside Chestnut Hill Academy where he taught middle and high school math for 17 years. During that time Mr. Wolf was awarded Teacher of the Year; he received an honorary chair and

was made an honorary alumnus of the school. As noted in the letters from family, friends, and former teachers, Andrew Wolf was completely dedicated to teaching and helping others grow intellectually. Even since he has been incarcerated, Andrew has been assisting other inmates at the Federal Detention Center. The letter from Ryan Keele, an inmate at the Federal Detention Center, reports Andrew helped him prepare for the GED so he was able to pass the examination.[23]

Finally, the overriding aspect of Mr. Wolf's character reported by his mother principally but also his father, is the degree of remorse he feels for having disappointed them, having victimized the same young people he was so enthusiastically teaching, for having lost the time he would otherwise have with those he loves including his infant daughter. Guilt, shame and remorse are aspects of personal growth along with an exemplary life outside of criminal behavior a court may consider in varying downward at sentencing.

Most defendants who come before the Court for these offenses have no prior record, not all have been so well beloved or made such a global contribution to those around them. Andrew Wolf, as a result of his conduct in this case, will lose his teaching certificate, the opportunity to contribute as he has for 17 years to the lives of young people not only in teaching but in coaching, and providing a good example to others. He also will lose his reputation as a good person and the standing in the community he previously enjoyed. Despite having been a loving son, committed teacher and baseball and math coach, he will be barred from participating in any of those activities. Instead, Andrew Wolf and will be universally known as a sex offender for the remainder of his life. That loss of reputation and standing in the community as well as his prior contributions to his school, his family, and his friends, are deserving of the Court's consideration for a downward variance. See e.g., commutation of I. Lewis "Scooter" Libby.[24] The Court should consider that the defendant's family continues to support the defendant, a factor not

---

[23] Andrew has also taken 17 classes while at the FDC. EXHIBIT J.

[24] Found at https://www.npr.org/templates/story/story.php?storyId=11667128 Exhibit K.

comprehended by the Guidelines. As noted in the PSR, his sister is available for him to live with her upon his release. Despite his crime they have not forsaken him. The fact that he will be welcomed back to his family is a strong incentive not to reoffend.

<u>Remorse and treatment</u>: Since his incarceration, Andrew Wolf has been in therapy with Dr. Elliot Atkins. He has not only admitted his conduct and entered a plea without any agreement as to its terms, but Mr. Wolf has also been exploring the nature of his conduct, causes of these offenses, and the means by which he will avoid reoffending. In addition, Mr. Wolf offered what little information he could toward assisting the Government in learning of other offenders, although it did not prove useful. Nonetheless, that effort is deserving of the Court's consideration. As the Court well knows, genuine remorse is a basis for a court to vary downwards. Considering these facts, a sentence under the Guidelines or above the mandatory minimum would be unreasonably high. See also *United States v. Stall*, 581 F.3d. 276 (6th Cir. 2009). (The defendant sentenced for possession to one day in jail with 10-years supervised release and a year of house arrest, not unreasonable, partly because his "exceptional expression of remorse, immediate cooperation with the investigation, commitment to counseling, and demonstrated promise for rehabilitation).

No less than Mr. Stall, Andrew Wolf is thoroughly remorseful and has every possibility of being rehabilitated over the course of a prison sentence in order to again be a positive force in others' lives a process he has already begun. See e.g. *United States v. Wachowiak*, 412 F.Supp. 2d. 958 (E.D. Wisc. 2006). The Seventh Circuit court affirmed (496 F3. 744 (7th Cir. 2007)) the downward variance in a downloading and distribution case from 121-151 months to 70 months as reasonable under § 3553 relying partly on the defendant's excellent character, genuine remorse, susceptibility to treatment, low recidivism risk according to psychologists, excellent work history and strong family support as reasons for the variance. The seventh Circuit noted a fact not always appreciated,

> Booker sentencing discretion is inevitably in tension with the congressional goals
> of achieving greater uniformity and proportionality in sentences through a system

of Guidelines sentencing. *Rita*, 127 S. Ct. at 2464. But we do not understand Booker's review for-reasonableness to empower us to displace district court sentencing judgments more aggressively than traditional abuse-of-discretion principles normally would allow. *Wachowiak*, 496 F.3d at 754.

Impact of incarceration as a first offender: Mr. Wolf has never committed a crime before and therefore incarceration has an even greater impact upon him than those with criminological experience. He expressed to both Dr. Atkins and Dr. Summerton he, "hates" being incarcerated.[25] Andrew wolf is not an individual unfamiliar with close family connections or friendships. He had them and forfeited those satisfying aspects of life to isolation, fear and the relentless routine, loss of autonomy and boredom of prison that for some is a comfort and for a first offender is an especially shocking and depressing experience. *United States v. Baker*, 445 F. 3d 987, 992 (7th Cir. 2006) (upholding reduction based on finding that "a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned." The especial effect of prison on a first time offender should be considered for a downward variance.

Post-offense Rehabilitation. Dr. Elliot Atkins evaluated Andrew Wolf at the FDC.[26] The Report diagnoses Andrew with Generalized Anxiety Disorder and Compulsive Personality Style.[27] Therapeutic sessions have provided some insight for Mr. Wolf in his expression of guilt for his feelings and revulsion for his actions, emotions which he feels more strongly given his personality structure. He is committed to remaining in treatment and to compensating all those affected by the damage he has done (p. 5). The defendant's sincere expression of remorse and efforts at rehabilitation are the only ways Andrew can demonstrate his current state of mind until he is released.

---

[25] Dr. Summerton found Andrew's mood, "somewhat depressed and anxious" as a result of his incarceration and legal status and the "radical departure from any environments he had previously enjoyed in his life." Summerton Report, p. 8. Dr. Summerton's testing bore out his impressions. (p.9).

[26] Report of Dr. Elliot Atkins, July 6, 2022, Exhibit L.

.

**§ 3553(a)(2) The Need for the Sentence Imposed—**

**A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense;**

Andrew Wolf has no criminal record. Nevertheless, Congress, determined the court must impose a fifteen (15) year mandatory minimum incarceration period. Such a lengthy sentence for a first offender of itself indicates the grave nature of the offenses.

A sentence that recognizes the individual circumstances of the case garners greater respect for the law and is more just than one of overwhelming length mechanically imposed.

**(B) to Afford Adequate Deterrence to Criminal Conduct;**

1. Individual deterrence or recidivism.

The mandatory minimum sentence in this case is sufficient to deter the defendant from criminal conduct in this case. Dr. Atkins' evaluation concludes Andrew Wolf has a low risk of recidivism especially with treatment.[28]

USSC studies have long shown individuals with little or no criminal justice exposure have the lowest recidivism rates. Even among those with no prior convictions, the risk of reoffending by those without a prior *arrest* was the lowest of all at 2.5%.[29]

Mr. Wolf will also be approximately 57 years old if the court imposes the mandatory minimum. Again, although he will not reoffend for other reasons, the USSC's research indicates

---

[28] Dr. Atkins, and the defense, disagree with the Summerton Report's reliance on the author's clinical experience to predict the defendant's lack of insight forbodes recidivism. There is no clinical basis for the statement, and research contradicts both the accuracy of clinical experience as predictive and that lack of insight promotes reoffense. Supplemental Report of Dr. Atkins, December 16, 2022. Exhibit M.

[29] USSC Report,  Recidivism and the "First Offender,": May 2004, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf  Screen shot Exhibit N. p. 17.

older inmates released to supervision are less likely to recidivate than younger men as are college-educated men.[30]

General deterrence:

As for general deterrence, there is evidence the certainty of punishment rather than lengthy sentences effectively deters generally. See, Steven N. Durlaf and Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced*?, 10 Criminology & Pub. Policy13, 37 (2011):[31]

> The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect particularly from the vantage point of specific programs that alter the use of police.

Anyone informed of the losses Andrew Wolf will inevitably suffer resulting from the imposition of the mandatory minimum and the other aspects of a sentence under § 2G2.1 would recognize the risk of committing this offense.

In addition, the USSC's 2012 Study on child pornography suggested longer sentences may be associated with more frequent recidivism.[32] Again, the Commission's own data and experience suggest treatment is a more cost-effective and permanent means of protecting the public than lengthy sentences:

The commission cited emerging research indicating that child pornography offenders with clinical sexual disorders may respond favorably to treatment particularly if administered as

---

[30] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9 Screen Shot, Exhibit O.

[31] https://www.public.asu.edu/~gasweete/crj524/readings/04-12%202011-Durlauf-Nagin%20(imprisonment%20and%20crime%20-%20can%20both%20be%20reduced).pdf  Screen shot. Exhibit P.

[32] 2012 USSC Child Pornography Report, p. 303. https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses  Screen shot, Exhibit Q.

part of a 'containment model' involving cooperation among treatment providers, polygraph examiners, and probation or other supervising officers."[33]  Participation in available treatment as recommended would better serve both the defendant and the larger community than a disproportionately long sentence.

### (C) to Protect the Public From Further Crimes of the Defendant

Deterrence and protecting the public can be achieved by means in addition to incarceration. Andrew Wolf is subject to up to a lifetime of supervision under U.S.S.G. § 5D1.2(b). Institutional, then community based mental health and sex offender treatment and monitoring of his internet usage, which will no doubt be conditions of his supervised release, would deter and protect. See, *U.S. v. Richards*, 659 F.3d 527 (6th Cir. 2011) upholding a sentence of 16 years for a defendant convicted of eleven counts of production and distribution of over 600 images. He was a purveyor of Child pornography over the internet, had an addiction and was gay. The district court found that "if sixteen years of sex offender, mental health, and addiction treatment cannot change [the defendant's] pattern [of seeking sex with adolescents] certainly 30 or 40 years has no better chance of doing so." Id. at 551.

Andrew Wolf will participate in the treatment programs offered by the Bureau of Prisons and comply with the conditions of supervision this Honorable Court and Federal Probation deem necessary. He is not a risk for reoffense.

### (D) to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner;

---

[33] https://www.ussc.gov/about/annual-report/archive/annual-report-2013 USSC, 2013 Annual Report—Chapter Two: p. A-9. Screen shot, Exhibit R.

Andrew Wolf does not require educational, vocational or medical care from the Bureau of Prisons. However, The Bureau of Prisons' program, Sexual Offender Management Program offers some treatment opportunity for Andrew Wolf. Dr. Atkins and Dr. Summerton recommend sex offender treatment, and Dr. Summerton noted, "For his part, Mr. Wolf stated that he is 'open and eager to anything' of a therapeutic or treatment nature which would serve to improve his psychological functioning." (Summerton report, p. 13).

**(3) the Kinds of Sentences Available:**

Incarceration is the only available sentencing option, and Andrew Wolf fully expects that to occur. It is appropriate considering the nature of the offenses, and the relevant conduct even considering all the mitigating circumstances.

**(4) the Guideline Sentencing Range**

The Guideline range of life in this case is a product of the 2003 PROTECT Act's direct amendment of the Sentencing Guidelines, 18 U.S.C. § 2251 and the subsequent Guideline Amendments required to accommodate the Act's revisions. The Guidelines are trumped by the statutory maximum of 30 years for each of the eight counts. A mandatory minimum sentence of 15 years applies pursuant to 18 U.S.C. § 2251(e). None of the applicable provisions represents an application of the USSC's traditional role in bringing empirical study and experience to bear in setting sentencing policy. Therefore, the Court may reject the Guideline on a policy basis or find that, under the circumstances of this case, the Guideline deserves even less deference because of its history and nature.

The Specific Offense Characteristic for use of computer fails to differentiate between offenders since 47% of offenders in 2021 used a computer to produce child pornography.

Similarly, as noted above, 60% of defendants are in a position of trust, further broadening the application of enhancements and two-thirds of the internet victims were teenagers in 2019.[34]

The Guidelines are, according to former Supreme Court Justice Anthony Kennedy in need of reform. In a speech to the American Bar Association in 2003, Justice Kennedy called for the Sentencing Guidelines to be revised downward:

> The legislative branch has the obligation to determine whether a policy is wise. It is a grave mistake to retain a policy just because a court finds it constitutional. Courts may conclude the legislature is permitted to choose long sentences, but that does not mean long sentences are wise or just. Few misconceptions about government are more mischievous than the idea that a policy is sound simply because a court finds it permissible.

He concluded, "Our resources are misspent, our punishments too severe, our sentences too long."[35] The failure of the Guideline in the current case to approximate the goals of § 3553, the degree to which the Guidelines exceed the statutory maximum and the outsized penalty assessed against a first offender whether under the Guidelines or the statutory maximums reveal the unreasonableness in considering them as anything more than an "initial benchmark."


**(5) Any Pertinent Policy Statement—**

28 U.S.C. § 991

28 U.S.C. § 991(b)(1)(B) States in part the purpose of the USSC is to not only avoid unwarranted sentencing disparities, but to do so "while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." The Guidelines and policy failure to recognize the difference between offenders with zero prior records and those with any prior

---

[34] USSC Child Pornography Production Report, screen shot at fn. 15, p. 13.
[35] https://www.supremecourt.gov/publicinfo/speeches/viewspeech/sp_08-09-03 . Exhibit S, Screen shot.

record as well as the fact-specific differences between offenders sentenced under § 2G2.1 favors

more individualized sentencing for all cases involving the Guideline.

28 U.S.C. § 994

Two policy statements are not met by the sentencing construct of § 2G2.1: 28 U.S.C. §

994 (h) [basis for developing Guidelines near the maximum term authorized][36] and 28 U.S.C.

U.S.C. § 994 (l) [incremental sentencing]:

28 U.S.C.S. § 994(i) The Commission shall assure that the Guidelines specify a sentence to a substantial term of imprisonment for categories of defendants in which the defendant—

**(1)** has a history of two or more prior Federal, State, or local felony convictions for offenses committed on different occasions;

**(2)** committed the offense as part of a pattern of criminal conduct from which the defendant derived a substantial portion of the defendant's income;

**(3)** committed the offense in furtherance of a conspiracy with three or more persons engaging in a pattern of racketeering activity in which the defendant participated in a managerial or supervisory capacity;

**(4)** committed a crime of violence that constitutes a felony while on release pending trial, sentence, or appeal from a Federal, State, or local felony for which he was ultimately convicted; or

**(5)** committed a felony that is set forth in section 401 or 1010 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 841 and 960), and that involved trafficking in a substantial quantity of a controlled substance.

---

[36] 28 U.S.C. § 994 **(h)** The Commission shall assure that the Guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—
**(1)** has been convicted of a felony that is—
    (A) a crime of violence; or
    (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46 [46 USCS §§ 70501 et seq.]; and
(2) has previously been convicted of two or more prior felonies, each of which is—
    (A) a crime of violence; or
    (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46 [46 USCS §§ 70501 et seq.).

The conduct in this case does not meet the elements of § 994(i) yet the Guidelines operate not only to produce a "substantial" sentence but one that well exceeds the statutory maximum. Similarly, the Guidelines contravene § 994(h) by placing a first offender at the top if the sentencing ranges for a non-qualifying offense. These aspects of the statute and consequent effect on the defendant's liability are reasons to vary downward.

**(6) The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have been Found Guilty of Similar Conduct;**

The issue of disparity should focus on whether it is indeed unwarranted. Under all the facts related to the defendant, his history and condition and the circumstances of this case a difference from the typical case is justified in order to avoid sentencing similarities of a defendant convicted of dissimilar conduct. *U.S. v. Gall*, 552 U.S. 38, 55 (2007). It is suggested that differences in defendants applies equally if, "'[I]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Pepper v. United States,* 562 U.S. 476, 131 S.Ct. 1229, 1239–40, 179 L.Ed.2d 196 (2011) (quoting *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). The Supreme Court in *Pepper* also rejected the invitation to elevate the disparity element of § 3553 above other sentencing factors.

The Third Circuit has done the same with reference to fast track immigration sentencing in *Arrelucea–Zamudio*:

> We are not convinced that this discretion would result in further disparity. In any event, we disagree that the possibly greater disparity perceived would justify proscribing the discretionary authority of a sentencing judge. As *Kimbrough* explained, "[t]o reach an appropriate sentence, these disparities

> must be weighed against the other § 3553(a) factors and any unwarranted disparity created by the crack/powder ratio itself," *United States v. Arrelucea-Zamudio, 581 F.3d 142, 156 (3d Cir. 2009)*

Andrew Wolf is an exceptional person who led an exemplary life before and aside from the offense conduct that swept away his reputation, denied him custody of his daughter and the fulfilling livelihood he had previously known. The offense conduct itself did not entail physical contact or injury. He did not facilitate another's commission of sexual assault. Andrew Wolf is remorseful, and his family remains supportive of him and his commitment to the rehabilitation he has already begun. His complete lack of prior record indicates he will not reoffend. Mr. Wolf may return to the community after a period of incarceration and still offer some useful contribution. These factors militate in favor of a sentence to the mandatory minimum and against enforcing an uncertain sentencing disparity.

**The Downward sentencing Trend in Child Pornography Cases**

Finally, District Courts have been imposing lower sentences even in child pornography production cases since *Booker*.[37] Even as the sentencing Guideline range under U.S.S.G. § 2G2.1 increased from an *average* of 119 months prior to the PROTECT Act (1996-2003) to 282 in 2011, (a 13-year increase) the rate of below-range non-governmental sponsored sentences increased from 9% to 20% despite the PROTECT Act's prohibitions on downward departures. The extent of reduction has averaged 27.4% for production offenses since *Booker*. (See, the USSC 2021 Child Pornography Report, page 23). As discussed in section IV of this memorandum, 57% of offenders receive a non-government sponsored downward variance.

---

[37] USSC 2012 Report to Congress: Continuing Impact of Booker, Part C, Child Pornography Offenses, p. 2.

**Selected Sentencing Characteristics**
**Child Pornography Production Offenses**
***Koon* Period through *Gall* Period**

| | *Koon* Period (6/13/96 - 4/30/03) | PROTECT Act Period (5/1/03 - 6/24/04) | *Booker* Period (1/12/05 - 12/10/07) | *Gall* Period (12/11/07-9/30/11) |
|---|---|---|---|---|
| | Percent | Percent | Percent | Percent |
| **GUILTY PLEA** | 93.0 | 93.6 | 91.1 | 90.0 |
| **WEAPON** | 1.0 | 0.0 | 0.3 | 0.1 |
| **GUIDELINE ADJUSTMENTS** | | | | |
| Aggravating Role (USSG §3B1.1) | 6.0 | 3.7 | 1.7 | 1.0 |
| Mitigating Role (USSG §3B1.2) | 1.6 | 0.9 | 1.7 | 0.0 |
| **SENTENCE RELATIVE TO GUIDELINE RANGE** | | | | |
| Within Range | 72.5 | 84.0 | 64.5 | 58.0 |
| Above Range | 10.2 | 6.6 | 11.2 | 5.7 |
| All Gov't Sponsored Below Range | 7.3 | 7.5 | 13.2 | 16.0 |
| Substantial Assistance (USSG §5K1.1) | 7.0 | 5.7 | 5.7 | 4.2 |
| Early Disposition Program (USSG §5K3.1) | n/a | 0.0 | 0.0 | 0.1 |
| Other Gov't Sponsored Below Range | n/a | 1.9 | 7.4 | 11.7 |
| Non-Gov't Sponsored Below Range | 9.9 | 1.9 | 11.2 | 20.3 |
| | Months | Months | Months | Months |
| **AVERAGE GUIDELINE MINIMUM** | 119 | 142 | 240 | 282 |
| **AVERAGE SENTENCE** | 133 | 164 | 244 | 272 |
| Within Range | 132 | 160 | 257 | 285 |
| Above Range | 245 | 259 | 296 | 335 |
| All Gov't Sponsored Below Range | 79 | 154 | 176 | 221 |
| Substantial Assistance (USSG §5K1.1) | 77 | 102 | 156 | 197 |
| Early Disposition Program (USSG §5K3.1) | n/a | - | - | 120 |
| Other Gov't Sponsored Below Range | n/a | 310 | 192 | 230 |
| Non-Gov't Sponsored Below Range | 63 | 67 | 200 | 257 |
| **AVERAGE EXTENT OF REDUCTION** | Percent (Months) | Percent (Months) | Percent (Months) | Percent (Months) |
| All Gov't Sponsored Below Range | 38.3 (41) | 19.5 (25) | 29.5 (72) | 28.7 (71) |
| Substantial Assistance (USSG §5K1.1) | 39.3 (41) | 22.6 (29) | 33.1 (71) | 35.2 (83) |
| Early Disposition Program (USSG §5K3.1) | n/a (n/a) | - | - | 0.8 (1) |
| Other Gov't Sponsored Below Range | n/a (n/a) | 0.7 (1) | 26.4 (73) | 26.6 (67) |
| Non-Gov't Sponsored Below Range | 38.2 (35) | 40.9 (42) | 27.2 (49) | 27.6 (63) |

Categories may not sum to exactly 100.0 percent due to rounding.
SOURCE: U.S. Sentencing Commission, 2011 *Booker* Report Datafiles.

USSC 2012 *Booker* R. Part C. p. 10



**Quarterly Data for Within-Range and Out-of-Range Sentences**
**Child Pornography Production Offenses**
**Fiscal Years 1996-2011**

SOURCE: U.S. Sentencing Commission, 2011 Booker Report Datafiles.

USSC 2012 *BOOKER* R. Part C, p. 11

**(7) the Need to Provide Restitution to Any Victims of the Offense.**

Of course, the defendant will pay restitution and assessments as required.


**VI. CONCLUSION:**

For all the above stated reasons, the defense recommends this Honorable Court impose the mandatory minimum sentence of fifteen years on counts 1-8 and the special assessments as required. The designation for the defendant should be to a facility where he may receive sex offender treatment including Sex Offender Management Treatment. The court has the authority to require up to a lifetime term of supervision following his release as well as other sex offender provisions.


Respectfully Submitted,

Heather J. Mattes
Attorney for Andrew Wolf


/s/Arthur T Donato, Jr.
Arthur T. Donato, Jr.
Attorney for Andrew Wolf

**CERTIFICATE OF SERVICE**

       I hereby certify that this Sentencing Memorandum, Appendix and associated Exhibits have been served on the following via Electronic Case Filing in the Eastern District of Pennsylvania. (ECF)

Kelly Harrell

Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street,
Suite 1250
Philadelphia, PA  19106
Assistant United States Attorney

kelly.harrell@usdoj.gov

 February 8 2023
Date

Heather J. Mattes
Attorney for Andrew Wolf