APPENDIX

<u>Historical Congressional Directives Affecting Sentencing Guidelines § 2G2.1 and § 2G2.2</u>

Following the passage of the Sentencing Reform Act of 1984, [hereinafter, SRA] the United States Sentencing Commission was instituted "to establish sentencing policies and practices for the federal criminal justice system, including the purposes of sentencing stated at 18 U.S.C. § 3553(a)(2), "through review of comments and data including past sentencing practices."[1] Congress' intent in "was to eliminate an 'unjustifiably wide range of sentences [imposed on] offenders with similar histories, convicted of similar crimes, committed under similar circumstances,' and to recognize differences between offenses."[2] "The increase in uniformity however was not to be achieved through sacrificing proportionality. The Guidelines must authorize appropriately different sentences for criminal conduct of significantly different severity."[3] In the intervening decades, Congress has amended 18 U.S.C. § 2251 and the applicable Sentencing Guidelines notably by directives to the Commission. The Commission has also amended U.S.S.G. § 2G2.1 (applicable to 18 U.S.C. § 2251) and U.S.S.G. § 2G2.2 (applicable to 18 U.S.C. § 2252) both in response to congressional directives and on its own initiative.[4] The history of the amendments governing sentencing for 18 U.S.C. § 2251 establishes a lack of empirical basis for the current U.S.S.G. § 2G2.1.

---

[1] 28 U.S.C. § 994(o).

[2] USSC Report: The History of the Child Pornography Guidelines, 2009, p.2 citing 28 U.S.C. § 994(m). https://www.ussc.gov/research/research-reports/2009-history-child-pornography-Guidelines  EXHIBIT T.

[3] USSC 1987 Supplementary Report, Initial Sentencing Guidelines, p. 13. https://www.ussc.gov/Guidelines/Guidelines-archive/1987-supplementary-report-initial-sentencing-Guidelines-and-policy-statements  EXHIBIT U.

[4] Because only the production guideline is applicable to this case, the discussion is limited mostly to USSG § 2G2.1.

In 1987, the year Sentencing Guidelines were promulgated, the base offense level was 25 for U.S.S.G. § 2G2.1. During fiscal year 1990, 31 production cases were prosecuted nationwide, none of them for pecuniary gain.[5]

In 1991, the base offense level for production of child pornography remained at 25. The Commission amended U.S.S.G. § 2G2.1 to add a 4 level enhancement for minors less than 12 and a "special instruction" to consider each victim separately. Of the eight cases prosecuted nationally, the sentences ranged from one year and a day to 70 months. In one case, the district court departed downward due to the "lack of a commercial aspect" to the offense conduct. The USSC's 1991 Report concluded U.S.S.G. § 2G2.1"appear[ed] to be "working as intended."[6] Of the forty-nine judges surveyed regarding the child sex offense Guidelines as part of the report, four or 8% thought they required improvement.[7] Congress had already initiated amendments to U.S.S.G. § 2G2.1 when the 1991 Report was published.

Under "The Sex Crimes Against Children Prevention Act of 1995,"[8] Congress directed the USSC to increase the base offense levels for U.S.S.G. § 2G2.1 "by at least two levels" (section 2), and to increase the base offense level by the same increment if a computer was used (section 3).[9] Congress also ordered the Commission to produce a Report on recidivism and an analysis of sentences imposed for 18 U.S.C. § 2251.

---

[5] 1990 Staff Report, p. 13, cited in 2009 USSC Report History of the Child Pornography Guidelines, p. 13. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf   Exhibit V.

[6] Child Sex Offense Working Group Report, December 1991, p.12. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/working-group-reports/sex-offenses/121991_Child_Sex_Offenses.pdf   Exhibit W.

[7] Id., p. 16.

[8] December 23, 1995, 109 Stat 774.  (Pub. L. 104-71).

[9] The directive began as a more specific House Resolution to raise the base offense levels "by at least two levels" for violation of 18 U.S.C. 18 U.S.C. § 2251(c)(1)(A) where a computer was used to "transmit the notice of," or "transport or ship" the visual depictions." H.R. Rep.104-90, 1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg. Hist.).  The brief debate on the matter focused on punishing those in the business of producing and distributing child pornography for profit. *See*: Troy Stabenow, "The Myth of Careful Study:

The USSC complied with congress' directives. The Commission's June 1996 Report[10] did not recommend raising the Guidelines any further at that time based on "the range of punishments available" to distinguish between individual and commercial offenders in production cases.[11] However, it did recommend increasing the statutory maximum for 18 U.S.C. §2251 to 15 years because defendants sentenced under U.S.S.G. § 2G2.1 in 1994 and 1995 were already subject to offense levels "that result in sentences approaching the statutory maximum, particularly when specific offense characteristics (such as production involving a minor under 12 years of age) apply to enhance the sentence." That fact increased the likelihood the ten-year statutory maximum would trump sentences if additional offense characteristics were added:

> Increasing the statutory maximum for offenses under 18 U.S.C. §2251 also provides more flexibility for the courts to depart upward from the guideline *in particularly egregious cases* and makes production a more serious offense than trafficking or receipt."[12] (emphasis added).

Congress had also tasked the Commission consider whether longer sentences for sex offenses against children affected recidivism. The recidivism data was inconclusive, and the Report's examination of risk classification instruments then available ultimately concluded, "[a]t this time the data are insufficient to base sentencing policy on these methods of classification."[13]

---

Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines,                                                                       pp                                                           10-11 https://mow.fd.org/sites/mow/files/cja_resources/uploads/the%20flawed%20progression%20of%20the%20child%20pornography%20Guidelines.pdf. EXHIBIT X.

[10] Report to Congress: *Sex Offenses Against Children Findings and Recommendations Regarding Federal Penalties*, USSC June 1996 (Hereinafter, USSC 1996 Report) https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/199606-rtc-sex-crimes-against-children/199606_RtC_SCAC.pdf  EXHIBIT Y.

[11] *Id.* pp. 6-8. In the Report's example, the major child pornography producer received a sentence of 120 months while the single offender was sentenced to 51 months incarceration.

[12] *Id.*, pp. 38-39.

[13] Id., p. 36.

The USSC 1996 Report focused on "the most dangerous offenders" at a time when federal authorities prosecuted 112 cases nationally.[14] Federal authorities prosecuted only the most egregious cases in 1994-1995.[15] State courts prosecuted ordinary offenders. The Commission concluded "a significant portion of child pornography offenders have a criminal history that involves the sexual abuse or exploitation of children and that those with such histories are at a greater risk of recidivism."[16]

The USSC 1996 Report also reviewed the two-point enhancement for computer use required by congressional amendment and concluded:

> Persons who transmit the images, however, may be mailing a single photo to a friend, or they may be more similar to a person who opens an adult bookstore in every city in the world. Not all computer use is equal. Some uses lead to more widespread dissemination of child pornography and to increased accessibility of pornography and other sexually explicit dialogue to children. Sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's crime.[17]

The Commission suggested:

> Congress and the Commission may wish to develop a more finely-tuned system of apportioning punishment in cases involving the use of computers. For example, an upward departure might be recommended in cases in which a computer was used to widely disseminate pornography, or in which pornography was made accessible to children. Alternatively, the two level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes it widely accessible such as posting it on a BBS or a website.[18]

---

[14] The Commission studied 423 cases, of which only 112 cases involved child pornography. Id. at 1, 2. Of the 112, 90 were limited to possession, receipt, or trafficking of child pornography. Id. at 4. Stabenow Report, p. 13.

[15] See H.R. Rep. 104-90, 1995 U.S.C.C.A.N. 759, 1995 WL 136512 (Leg. Hist.) and Compendium of Federal Justice Statistics, 1993 at Table 1.2.

[16] Id., p. i, 3, 29.

[17] Id., p. 29

[18] Id., pp.29-30 & n. 23.

The Commission complied with congressional mandate in Amendment 537 (USSG, App. C, Nov. 1, 1996) raising the base offense level for U.S.S.G. § 2G2.1 to 27 and adding the 2-level enhancement for computer despite its own recommendation for greater nuance.  As a result of the congressional directives, the new range "increased sentences for all pornography Guidelines by approximately 25 % […]. In addition, a further 25% increase was provided for the use of a computer in child pornography offenses."[19]  The Commission's concern is even more pointed today than in 1996 as many cases of production involve the use of a computer. An offense characteristic applicable to nearly every case does not differentiate between offenders.

In September 1996, Congress found, among other things, that (3) "child pornography is often used a part of a method of seducing other children into sexual activity; (12) prohibiting the possession of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children."[20] The Child Pornography Prevention Act of 1996 established a ten-year mandatory minimum for 18 U.S.C. § 2251 for first offenses; fifteen years for a second and thirty years to life for a third, the so-called "three strikes" legislation. (Subsection 4).

The original purpose of the 2003 PROTECT Act, PL 108-21[21] was to institute the popular Amber Alert program and address virtual child pornography.[22] Freshman Congressman Tom

---

[19] USSC SEX OFFENSES AGAINST CHILDREN, Findings and Recommendations Regarding Federal Penalties, June 1996, p. ii. Infra. (The Report was required under SCACPA, Sec. 6) The Report was published while Amendment 537 was still pending.

[20] Pub. L. 104-208, "Child Pornography Prevention Act of 1996," Pub. L. 104-208, (Sept. 30, 1996) 110 Stat. 3009-30.

[21] Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub. L. 108-21 Sec. 103 (April 30, 2003)

[22] The sense of the Congress emphasized its focus on bigger offenders: "It is the sense of Congress that the Child Exploitation and Obscenity Section of the Criminal Division of the Department of Justice should focus its investigative and prosecutorial efforts on major producers, distributors and sellers of obscene material and child pornography who use misleading methods to market their material to children.

Feeney proposed the "Feeney Amendment" while the house bill was under consideration in conference.[23]

When the PROTECT Bill returned to the senate in April 2003 including the Feeney Amendment, Senator Hatch gave an impassioned endorsement of the Bill:

> Thanks to our House colleagues, we in the Senate now have an opportunity to pass not only an AMBER alert bill, but a truly comprehensive package of measures that will protect our children from vicious criminals, pornographers, sexual abusers, and kidnappers. These types of individuals who prey on our Nation's youth are nothing less than the scum of the earth who deserve every ounce of punishment which we as a nation can fairly and justly mete out.[24]

Relying on the "Butner study," Senator Hatch emphasized a "disturbing fact about child pornographers: that "shows that 76% of child pornographers and those who have been convicted of travel in interstate commerce to commit sex acts with minors admitted to undetected sex crimes with an average of 30.5 child sex victims."[25]

The supposedly excessive number of downward departures was a principal evil the Feeney Amendment sought to address.  Senator Hatch claimed the number of downward departures had increased 50% and had to be stemmed by amending the Guidelines reducing

---

Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 PL 108-21, April 30, 2003, Sec. 602(a).

[23] The lack of notice to the USSC, authorship of the Amendment by two Department of Justice attorneys and the objection to it are detailed in Troy Stabenow's article, Infra., pp. 19-21; and www.legalaffairs.org/issues/March-April-2004/story_gerber_marpar04.msp *Down with Discretion*, attached as EXHIBIT Z.

[24] 149 Cong. Rec. S5113-01, 149 Cong. Rec. S5113-01, 2003 WL 1856881

[25] The Butner Study has since been challenged on methodological grounds including the possibility the data was falsified. See, e.g., Richard Wollert, Ph.D.  *The Implications of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders*: Written Testimony Presented to the U.S. Sentencing Commission (February 15, 2012) p.19: "Five major conclusions emerged from our simple but interpretable study of a representative sample of federal CPOs [child pornography offenders]. First, average estimated risk level as measured by Static-99R was low. Second, the obtained contact sex offense recidivism rate of CPOs was very low; this was confirmed in a follow-up study of a similar sample from New York. Third, a minority – about 15 % – had been convicted of contact sex offenses prior to their index pornography conviction. Fourth, about 90% of federal CPOs successfully completed their term of probation.  Fifth, self-report data from CPOs are highly susceptible to error in the absence of studies that verify their reliability and group-specific validity."

available departures and imposing requirements for District Judges to report in writing the reasons for them to the Chief Judge to limit judicial discretion. The USSC's only opportunity for comment was a short letter where the Chair attempted to explain the downward departures issue was complex involving several factors:

> [I]t appears that there are a number of factors that need to be examined and understood before drawing conclusions on the non-substantial assistance departure rate. One such factor is the impact on the non-substantial assistance departure rate resulting from policies implemented in a number of districts in an effort to deal with high volume immigration caseloads. For example, in 2001, the overall non-substantial assistance departure rate was 18.3 percent. If those districts with departure policies crafted to address these high volume immigration caseloads are filtered out, the non-substantial assistance departure rate is reduced to 10.2 percent.

The Commission letter noted the purpose and importance of departures in creating fair and reasonable sentences considering the limits of Sentencing Guidelines:

> Congress also recognized, however, that guideline sentences would not fit all cases and instructed the Commission to maintain sufficient flexibility in the drafting of Guidelines to permit individualized sentences when warranted by mitigating or aggravating factors not otherwise taken into account. See 28 U.S.C. s991(b)(1)(B). Based on this congressional policy, the Commission developed the concept of permitting courts to depart either upwards or downwards in unusual or atypical cases that fell outside the "heartland" of a particular guideline. The Commission adopted the departure policy not only to carry out congressional intent but also *in recognition of the limits of adopting a perfect guideline system that would address all human conduct that might be relevant to a sentencing decision.* (Emphasis added)[26]

The Commission was not given a "fair opportunity to consider and comment" on the Feeney Amendment and its explanation had no effect on its enactment. [27]

---

[26] Letter from The Sentencing Commission's voting members to Senator Orrin Hatch.

[27] The Commission's analysis of downward departures was quickly corroborated. e.g. *Handcuffing Justice: The Shaky Empirical Foundations of the Feeney Amendment*, 2005 Northwestern University School of Law finding that "there is no doubt that downward departures increased, but they did not do so to the extent suggested by proponents of the Feeney Amendment if one is willing to consider offense characteristics and district effects." p. 29. "The empirical arguments offered by the proponents of the Feeney Amendments were deeply flawed.  While departure rates increased recently, much of this increase is attributable to changes in the composition of the federal criminal caseload." p. 43. *See also:* Alan Vinegrad: *The New Federal Sentencing Law:* Federal Sentencing Reporter, Vol. 15, No. 5 June 2003.

Similarly, noting the paucity of either debate or collaboration with the judiciary or the Sentencing Commission, the Judicial Conference decried the "lack of careful review and consideration that this proposal has received." In its letter to Senator Hatch, the Conference explained, among its concerns regarding limiting downward departures, its opposition to direct amendment of the USSG:

> The Judicial Conference opposed direct congressional amendment of the Sentencing Guidelines because such amendments undermine the basic premise in establishment of the Commission—that an independent body of experts appointed by the President and confirmed by the Senate is best suited to develop and refine Sentencing Guidelines.[28]

Senator Hatch suggested to the Senate the basic elements of the compromise version to the Feeney Amendment were to:

> No. 1, limit, but not prevent, downward departures only to enumerated factors for crimes against children and sex offenses;

> No. 2, change the standard for review of sentencing matters for appellate courts to a de novo review, while factual determinations would continue to be subject to a "clearly erroneous" standard;

> No. 3, require courts to give specific and written reasons for any departure from the Guidelines of the Sentencing Commission; and

> No. 4, require judges to report sentencing decisions to the Sentencing Commission.

> It is important to note that the compromise restricts downward departures in serious crimes against children and sex crimes and does not broadly apply to other

---

Other statistics further belie the notion, advanced by the bill's sponsors, that downward departures had become routine. Over the prior six years, the increase in non-cooperation/fast track downward departures had been incremental at best—from 9.6% (1996) to 10.3% (1997) to 11.1% (1998) to 13.0% (1999) to 13.5% (2000) to 14.7% (2001). On average, since *Koon*, district judges have downwardly departed in these cases only 12.2% of the time. DOJ statement to Associate Deputy Attorney General Daniel P. Collins before the Subcommittee on Crime, Terrorism and Homeland Security of the House Subcommittee on the Judiciary at 28.

[28] Judicial Conference letter, April 3, 2003, from the congressional record, 149 Cong. Rec. S5113-01, 2003 WL1856881.

crimes, but because the problem of downward departures is acute across the board, the compromise proposal would direct the Sentencing Commission to conduct a thorough study of these issues, develop concrete measures to prevent this abuse, and report these matters back to Congress.

For those who want to oppose these needed sentencing reforms, I remind them that the Sentencing Reform Act of 1984 was designed "to provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."[29]

Members of the Senate including Senator Kennedy, an author of the 1984 SRA, objected

strongly to the process by which the Feeney Amendment was created and amended:

We are enormously supportive of the AMBER bill, but we question and wonder why it should carry with it such extraneous kinds of material which this legislation in this conference report carries. In the final hours of the consideration of the AMBER bill in the House of Representatives, there was an amendment to the AMBER bill offered by Congressman Feeney. In a period of 20 minutes, it was accepted without any hearings. It was a part of the conference.  The Feeney amendment affected the whole issue of sentencing, not just for these kinds of heinous crimes that take place against children but also against the underlying concept of our criminal sentencing provisions, affecting every type of criminal sentence, whether we are talking about terrorists, murderers, burglars or white-collar crime.

The amendment had nothing to do with the abduction of children, but would affect all of the other circumstances. It was never very clear whether that was intended or not. What was brought to my attention and concerned me was the observation that was made by the Chief Justice of the Supreme Court. He observed the Feeney amendment will do serious harm to the basic structure of the Sentencing Guidelines system and seriously impair the ability of courts to impose just and responsible sentences.

We are all for the AMBER legislation.  We are all for the appropriate kinds of penalties for those who are going to violate the law, but this legislation is much more. However the Feeney amendment would do serious harm to the basic structure of the Sentencing Guidelines system and will seriously impair the ability of courts to impose just and responsible sentences. This is not just an objection from the Senator of Massachusetts, or from the Senate Democrats, this is an objection expressed by the Chief Justice of the United States.

I was personally quite amazed that the Chairman of our committee did not believe this kind of change in the criminal justice system was sufficiently important. I am amazed that he would not support the position of some of us who were conferees who

---

[29] 149 Cong. Rec. S5113-01, 149 Cong. Rec. S5113-01, 2003 WL 1856881. The reference to the Sentencing Reform Act could be considered ironic since the Amendment was promulgated absent input from any other body including the USSC, the body legislatively charged with creating and amending the sentencing Guidelines under the SRA, 18 U.S.C. § 994.

suggested that we ought to have a day of hearings to call in experts, perhaps even the Chief Justice of the United States, or Congressman FEENEY or others who might be in favor of the amendment. This would be an opportunity to understand what the implications were and whether or not it was going to undermine the criminal justice system, as the Chief Justice of the Supreme Court has suggested. But, no, that was turned down.  That suggestion that we have a hearing, chaired by Senator Graham of South Carolina, the chairman of our Criminal Justice Subcommittee on the Judiciary Committee was turned down. The suggestion that we might hold a hearing with the understanding that we would expedite any of the recommendations to make sure we were going to target whatever actions we were going to take on the subject matter of the AMBER circumstance, make sure we got it right, that was rejected and turned down.

Then a second suggestion was made to ask the Sentencing Commission to study this and report back in 180 days. Then, we would have an opportunity to look at what the Sentencing Commission had recommended. We could then either accept it or reject it or take whatever action in 180 days.  The House of Representatives has taken its time in sending this legislation over. We might be able to make a judgment about whether this should be done or considered in this particular way.

Over the period of these past days, just prior to going to the conference, I was amazed at the kind of additional support I received for the Chief Justice's position. I am sure the chairman of the committee received it as well.

The Judicial Conference of the United States said:

The Judicial Conference strongly opposes these sentencing provisions because they undermine the basic structure of the Sentencing Commission and impair the ability of the courts to impose just and responsible sentences.  We must note our concern and disappointment with the lack of careful review.

Not 1 day of hearings; not 1 hour of consideration; 20 minutes of debate on the floor and the Senate Judiciary Committee virtually accepted it.

Then it continues along to those three chairs of the Sentencing Commission. These are individuals who have been accepted and approved by advice-and-consent votes in the Senate: Dick Murphy, Richard Conroy, William Wilkins. William Wilkins, certainly one of the important conservative jurists who has served in the Federal court system, joined in saying:

The sentencing provisions are farfetched and effectively rewrite significant portions of the Sentencing Reform Act of 1984. No hearings have been held on a number of significant provisions of the current legislation urged our rejection of it. [30]

Eight hours later when the Feeney Amendment's greatest restrictions were limited by further amendment to downward departures on sex related crimes, the PROTECT Act passed.

---

[30] 149 Cong. Rec. S5113-01, (April 10, 2003) WL 1856881

The "Sentencing Reform" portion of the PROTECT Act was, of course substantially more comprehensive than the four points stated prior to the Senate vote. Among other amendments, the legislation:

1. For the first time, congress members wrote Guidelines text: Pub. L. No. 108-21, § 401(b), (g), (i), including commentary in some instances and ignoring the USSC's expertise and statutorily authorized role in the amendment process.

2. Allowed the number of judges on the commission to be reduced to zero and capped it at three.

3. Prevented the Commission from ever amending the guideline § 3E1.1 giving the government control over the two point downward variance for acceptance of responsibility.

The response to the sentencing reform legislation was immediate and critical:

Even more blatant [than the disrespect for federal judges evident in the legislation] was the rebuke of the Sentencing Commission inherent in this legislation. In enacting this bill, Congress (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure Guidelines for the next two years. All told, the statute is the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress nearly 20 years ago.[31]

Title I, section 103 of the PROTECT Act raised the maximum penalties for all Chapter 110 offenses. The statutory maximum for 18 U.S.C. § 2251 increased from 20 to 30 years and the mandatory minimum from 10 to 15 years. The Feeney Amendment directly and immediately amended the Sentencing Guidelines. No research study, body of experience or rationale justified

---

[31] Alan Vinegrad, *The New Federal Sentencing Law*, 15 Federal Sentencing Reporter 314-315. Also cited in *Stabenow* at pp. 22-23.

these decisions. Neither Congress nor later the Commission specified a need or a rational basis for these changes.

The Feeney Amendment directed the Commission to reduce review grounds for downward departures and "ensure a substantial reduction in the incidence of downward departures."[32] The congressional directives immediately amended the Guidelines to limit or prevent downward, but not upward, departures. It changed standard of appellate review to de novo under 18 U.S.C. § 3742(e) and limited the basis for resentencing on remand at 18 U.S.C. § 3742(g)(2).[33]

"As a result of" the PROTECT Act's amendment of 18 U.S.C. § 2251 increasing mandatory minimums, the USSC issued Amendment 664 to the Guidelines raising the base offense level for U.S.S.G. § 2G2.1 from 27 to 32 a 19% increase.[34] The Commission declared the level "appropriate" because "when combined with several specific offense characteristics which are expected to apply in almost every case the mandatory minimum imprisonment will be reached or exceeded *in almost every case* by the Chapter Two Calculations."[35] (emphasis added) Amendment 664 added the nearly universally applicable levels 2 levels to U.S.S.G. § 2G2.1 if the offense involved distribution, or use of a computer and 4 levels for sadistic or masochistic conduct.

The Commission's decision to peg the Sentencing Guidelines to mandatory minimum sentences and alter offense characteristics in U.S.S.G. § 2G2.1 was not an exercise of the practice, experience or empirical analysis upon which it was founded. As has been noted by others,[36] Congress originally created the Commission and placed it in the judicial branch of

---

[32] Pub. L. 108-21 401(m)(2)(A).

[33] *United States v. Booker* declared both of these provisions unconstitutional under the Sixth Amendment.

[34] USSG App. C. Supplement Amendment 664 (Nov. 1, 2003)

[35] USSG App. C Amendment 664 (Nov. 1, 2003).

[36] Stabenow Article.

government. The Supreme Court thereafter upheld the Sentencing Guidelines originally predicated on the idea the Commission was an independent agency[37] that would bring "judicial experience" to the "neutral endeavor" of sentencing. *Mistretta v. United States*, 488 U.S. 361, 407-408 (1989).[38] The Commission's purpose is to advise Congress toward developing "an effective, humane, and rational sentencing policy" pursuant to 28 U.S.C. § 994(a)(2). 18 U.S.C. § 994 "outlines the policies which prompted establishment of the Commission, explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations." *United States v. Chambless,* 680 F. Supp. 793, 796 (ED La. 1988)

Although the Sentencing Commission must consider the actions of Congress, its obligations, including proportionality, are separate and more comprehensive.[39] In 2007, the Criminal Law Committee of the Judicial Conference recommended the Commission establish base offense levels without regard to the mandatory minimums set by Congress and instead apply its own experience and expertise.[40] If the Sentencing Commission concluded the levels were appropriate, USSG § 5G1.1(b) would operate. By reacting to meet a political end and raising the base offense levels in U.S.S.G. § 2G2.1 and § 2G2.2, the USSC undermined the neutrality that gave the Commission its authority and entitled its actions to judicial deference.[41]

The history of U.S.S.G. § 2G2.1 and § 2G2.2 illustrates the tenuous relationship between these Guidelines and the Commission's Charter. Courts may recognize the lack of Guidelines' development through the Commission's traditional role using experience and empirical evidence

---

[37] 28 U.S.C. 991(a).

[38] See also, Stabenow, Infra, at p.25-26.

[39] 28 U.S.C. §994.

[40] Letter to Chairman Hinojosa, March 16, 2007quoting Justice Breyer's speech, *Federal Sentencing Guidelines Revisited*, (1998) noting how requiring Guideline sentencing and mandatory minimum sentences is riding two horses.  "And those horses, in terms of coherence fairness and effectiveness, are traveling in opposite directions."

[41] 28 U.S.C. §991.

to shape policy renders the Guideline at issue unlikely to yield a result that fulfills the requirements of 18 U.S.C. § 3553 and that is therefore unlikely to be reasonable under the totality of the circumstances.



EXHIBIT T



EXHIBIT U



EXHIBIT V



which "older more mature persons take advantage of others whose capability to make judgments about sexual activity has not matured."[3]  Aggravated sexual abuse carries a statutory maximum term of life imprisonment and a fine.  Sexual abuse has a maximum penalty of 20 years and a fine.

Section 2A3.1 has a base offense level of 27 and "represents sexual abuse as set forth in 18 U.S.C. § 2242.  An enhancement [of 4 levels] is provided for use of force; threat of death, serious bodily injury, or kidnapping; or certain other means as defined in 18 U.S.C. § 2241.  This includes any use or threatened use of a dangerous weapon."[2]  The guideline also provides for a 2-level enhancement if the victim is less than 16 years old and a 4-level enhancement where the victim is less than 12 years old.  Thus, if the defendant committed aggravated sexual abuse by force with a child less than 12, his offense level would be 35 rather than 27.  Offense level 35 requires a sentence of at least 18 years imprisonment for a first offender, unless the court finds factors justifying a downward departure.  In one of the most serious child sex crimes contemplated, abduction and forcible rape of a child under 12 in the custody or care of the defendant, where the victim suffers permanent or life threatening injury, the offense level would be 45.  An offense level of 45 requires a sentence of life imprisonment without parole, even for a first offender.[5]

B.      Amendments to §2A3.1

Section 2A3.1 was amended on two occasions:  **November 1, 1989, and November 1, 1991.**  (See Appendix A.)

EXHIBIT W



EXHIBIT ___X___
STABENOW SCREENSHOT SHOT



EXHIBIT Y



EXHIBIT Z